GREGORY J. LUNDELL (SBN 234941)
*greg.lundell@hglaw.com*
G. AMY LAI (SBN 291639)
*amy.lai@hglaw.com*
KASTURI SENGUPTA (SBN 318450)
*kasturi.sengupta@hglaw.com*
**HG LAW LLP**
111 North Market Street, Suite 900
San Jose, California 95113
Telephone: +1 669 213 1050
Facsimile: +1 669 500 7375

BRIAN J. BECK (*application for Pro Hac Vice forthcoming*)
*brian.beck@hglaw.com*
**HG LAW LLP**
75 Broad Street, Suite 510
New York, New York 10004
Telephone: +1 669 213 1058
Facsimile: +1 669 500 7375

Attorneys for Plaintiff
SōRSE Technology Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SōRSE TECHNOLOGY CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>VERTOSA, INC., a Delaware corporation,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff SōRSE Technology Corporation ("SōRSE" or "Plaintiff") files this Complaint for patent infringement against Defendant Vertosa, Inc. ("Vertosa" or "Defendant") and alleges:

**<u>INTRODUCTION</u>**

1. Plaintiff brings this action alleging Defendant's unlawful sale and continued use of methods for preparing cannabis emulsion products (the "Accused Methods") and services directing the manufacture of cannabis emulsion products by customers (the "Accused Services and

Products") directly and indirectly willfully infringe United States Patent No. 12,551,416 (**Exhibit 1**) pursuant to the Patent Act, 35 U.S.C. § 101, *et seq*.

2. SōRSE entered the cannabis industry in 2016 by addressing a fundamental technical barrier to mainstream cannabis consumption: the difficulty of reliably incorporating oil-soluble cannabinoids into water-based consumer products and creating stable cannabis emulsions that can quickly deliver the effects of the active cannabis compounds on the consumer. Unstable cannabis emulsions that take too long to deliver such effects can create inconsistent product quality and consumer experiences, which encourages dangerous consumer activity, such as taking overly high doses of cannabis in order to mitigate the unpredictable onset time of such emulsions.

3. In 2017, SōRSE publicly commercialized its water-compatible emulsion method designed to provide uniform dosing, stability, improved sensory characteristics, and predictable consumer experiences. SōRSE created a scalable technology that lets cannabis companies turn difficult-to-formulate oil-based cannabinoids into stable, consistently dosed, commercially viable consumer products. SōRSE developed a scalable B2B technology model in which cannabis and consumer-product companies could incorporate SōRSE into beverages, foods, and topicals. SōRSE has commercialized over 100 products with dozens of partners. Whitney Economics, a global leader in cannabis and hemp business consulting and research, estimated in its 2026 report that the hemp-cannabinoid sector has a $38.7 billion total addressable market, while the hemp-derived THC beverage industry is currently estimated to be $3-3.8 billion.

4. Vertosa is a cannabis infusion company that advertises nanotechnology and microemulsion systems. Vertosa entered the market as Nanogen Labs in 2018 and later rebranded to Vertosa in 2019. Vertosa began its commercial rollout in 2019, competing directly with SōRSE.

5. On information and belief, Vertosa falsely represents to SōRSE's customers that its cannabis emulsions are of equivalent quality to SōRSE's emulsions, and can be substituted one-for-one for SōRSE's emulsions in customers' formulations at a lower cost.

6. On information and belief, Vertosa is undercutting SōRSE's sales with subpar emulsions using SōRSE's patented technology, harming SōRSE's reputation, causing market

confusion and price erosion, posing risks to consumers, and reducing SōRSE's sales in a competitive nascent market.

## PARTIES

7. Plaintiff SōRSE is a Delaware corporation with its principal place of business at 650 S. Orcas Street, Suite 103, Seattle, WA, 98108.

8. On information and belief, Defendant Vertosa is a corporation organized under the laws of the State of Delaware, and has a principal place of business at 1630 N. Main St. Ste. 363 Walnut Creek, CA 94596.

## JURISDICTION AND VENUE

9. This is an action arising under the patent laws of the United States. Accordingly, this court has subject matter jurisdiction over SōRSE's claims under the Patent Act pursuant to 28 U.S.C. §§ 1331 and 1338(a).

10. This court has personal jurisdiction over Vertosa because Vertosa has its principal place of business in Walnut Creek, California. Vertosa has also committed such purposeful acts and/or transactions in the State of California that it reasonably knew and/or expected that it could be hauled into a California court as a future consequence of such activity. Vertosa made, used and/or sold infringing products within the Northern District of California, has a continuing presence within the Northern District of California, and has the requisite minimum contacts with the Northern District of California such that this venue is a fair and reasonable one.

11. Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(c) and 1400(b) because Vertosa's principal place of business is in this District, and Vertosa therefore resides in this District.

## FACTUAL ALLEGATIONS

12. SōRSE presents its claims and allegations herein in conjunction and/or in the alternative. To the extent that certain claims or allegations may be inconsistent with one another, such allegations should be understood to be made in the alternative.

**A. The Cannabis Emulsion Industry**

13. Cannabis is a plant genus that includes varieties cultivated for different purposes, including hemp and marijuana ("cannabis"). The Cannabis plant genus contains over 80 naturally occurring compounds called "cannabinoids," including tetrahydrocannabinol (THC) and cannabidiol (CBD). THC and CBD can be extracted from hemp or cannabis. THC is generally considered psychoactive; CBD is generally considered to be non-psychoactive. While there are multiple forms of THC in cannabis, delta-9 THC is the primary psychoactive compound.

14. Since 2018, regulators have characterized hemp and cannabis according to their THC content. While cannabis remains a controlled substance under federal law, the 2018 Farm Bill legalized hemp and defined it as a cannabis plant with less than 0.3% delta-9 THC. In full, the definition of hemp reads, "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o(1). Accordingly, since 2018, hemp-derived products have been allowed to enter interstate commerce, creating a market for CBD extraction and manufacturing, hemp-derived THC products, and hemp oils and beverages. Some states, including California, have developed their own cannabis regulatory systems, allowing for medical and/or recreational cannabis. State regulations generally include laws around cultivation, growing, extraction, processing, manufacture, formulation, distribution, transportation, sale at dispensaries, testing, packaging and labeling, advertising, possession, and consumption.

15. While cannabinoids such as THC and CBD can be extracted from cannabis plants like hemp and cannabis and can be distilled, purified, and isolated into highly purified cannabinoid oils, cannabinoid oil extracts (which are oils that, when left alone, would form oil droplets that are immiscible with water) are unsuitable for direct addition to water-based goods such as beverages, topicals, and edibles. Cannabinoids are oil-soluble molecules, hydrophobic, and do not naturally mix well into water. Cannabinoid oil droplets are unstable when added to water and can separate into layers, causing uneven cannabinoid distribution, visible rings or sediment, and inconsistent dosing between servings. While these oil droplets may be made to be smaller, e.g., through

sonication or high pressure homogenization they can coalesce into larger droplets and create a broad droplet size distribution, decreasing the stability of the good. Cannabinoids oils can also degrade through exposure to oxygen, light, heat, and unsuitable storage conditions. Additionally, formulations that work in neutral water may fail in a carbonated or acidic emulsion, which may destabilize an emulsion. Carrier oils, emulsifiers, surfactants, and cannabis extracts can create bitterness, grassy or earthy notes, foaming, or an undesirable mouthfeel. Thus, these THC and CBD oils must be further processed to be suitable to create an emulsion to add, for example, to water-based drinks.

16. The hemp market is facing regulatory changes. On December 11, 2026, federal legislation is anticipated to narrow the definition of hemp, replacing the 2018 Farm Bill's 0.3% delta-9 THC threshold with a 0.3% total THC threshold and excluding certain synthetic or chemically converted cannabinoids, intermediate products exceeding specified THC limits, and finished hemp-derived cannabinoid products containing more than 0.4 mg of THC and similarly intoxicating cannabinoids per container. The uncertainty around the changes to the definition of hemp mean that, after December 11, products were previously covered under the 2018 Farm Bill hemp exemption may no longer classify as hemp; instead, they may be classified as cannabis and would subject to the same restrictions as a controlled substance. Products that may have been legal under the 2018 Farm Bill's definition of hemp may become classified as cannabis under the 2026 legislation, restricting their ability to be sold through conventional retail channels. Businesses dependent on intoxicating hemp-derived products may face substantial compliance costs, reduced distribution opportunities, and potential closures. State-licensed cannabis businesses may face increased competition from consumers and manufacturers transitioning into state-regulated cannabis markets. It is unclear whether companies that make cannabis-infused goods will be able to continue to use the same supply chains to source their cannabinoid ingredients, or whether they will be required to seek out in-state cannabis sources, manufacturers, and distributors. For example, the 2026 Whitney Economics U.S. Hemp Cannabis Report notes: "An analysis of the potential impacts of the federal legislation indicates many respondents claimed that they will not be able to survive the implementation of the new laws. If this comes to fruition, there will be a

reduction in manufacturing, wholesale and retail revenues by $41.3 billion ($28.3 billion in retail sales). This is forecasted to eliminate 225,861 jobs that would earn $8.9 billion in wages. This would have a net economic impact of $56.6 billion in lost economic output based on a 2.1x retail revenue multiplier." 2026 Whitney Economics U.S. Hemp Cannabis Report, p. 38.

17. Ultimately, the extent of the regulatory changes and impact on the industry are unclear.

**B. Failure of Others Who Have Attempted to Enter the Cannabis Emulsion Market**

18. Since the legalization of hemp in 2018, several companies have attempted and failed to enter into and stay in the cannabis emulsion market. As businesses are unable to directly add cannabinoids into often water-based goods in a way acceptable to consumers, cannabis emulsions are an important part of the cannabis industry's transition from traditional flower, concentrates, and oils. Commercially successful emulsions must maintain consistent cannabinoid concentration throughout the product, physical stability and resistance to separation, appropriate droplet size and distribution, compatibility with beverage ingredients, stability under different temperatures and storage conditions, consistent sensory characteristics, including taste and mouthfeel, consistent performance throughout the product's shelf life, and resistance to leeching into the product's container.

19. However, many companies in the commercial cannabis business that have attempted to create a consistent emulsion have failed to achieve commercial success. Failed companies in the sector include New Frontier Brewing, which suspended its attempts to pursue its cannabis emulsion technology;[1] New Age Nanotech, which licensed but subsequently failed to successfully commercialize Solutech, its water-soluble cannabinoid delivery technology;[2] the Genius Fund, a heavily funded cannabis venture that attempted to build a comprehensive cannabis business in California[3]; Resonate Blends, a California-based company which partnered with

---

[1] https://www.bizprofile.net/ca/costa-mesa/new-frontier-brewing-company

[2] https://financialfilings.com/filings/xebra-brands-ltd/annual-report/2024/47532998/

[3] https://www.bevnet.com/news/2021/back-from-collapse-day-one-relaunches-cbd-beverage-line

Vertosa but failed due to commercial underperformance;[4] Truss CBD USA, a joint venture between Molson Coors and HEXO that explored the U.S. CBD beverage market but exited the market citing the uncertain regulatory environment;[5] and Lyvly, a company that failed to get a product successfully to market.[6]

**C. SōRSE's Technology**

20. SōRSE is a technology pioneer. From its research and development efforts, SōRSE developed a portfolio of over 13 patents and pending patent applications in the U.S. and abroad covering a wide variety of cannabis emulsion technologies. The patent asserted in this lawsuit is directed to critical aspects of cannabis emulsion technology, the same emulsion technology Vertosa uses in its commercial processes.

21. Howard Lee founded SōRSE in November 2016, entering a nascent cannabis-infused product market. SōRSE's proprietary and patented technology created not only a viable emulsion that addressed the technical issues around creating scientifically stable and consistent infused beverages, goods, and topicals, but also created a platform to provide cannabis emulsion products for industry leaders such as Cann, CENTR, APRCH, Mad Tasty, and Copa.

22. SōRSE partners with companies who are interested in entering into a quickly evolving cannabis good market, creates emulsions tailored for their specific products, and guides them through the commercialization process. Each SōRSE emulsion is a signature, product-specific emulsion. SōRSE additionally provides mobile run production support, allowing brands to scale and expand to additional legal markets. SōRSE configures each emulsion for each product to fit product requirements, adjusting for viscosity, temperature, and taste, developing custom flavor profiles and blends.

---

[4] https://www.globenewswire.com/news-release/2022/04/18/2423632/0/en/Resonate-Blends-Issues-Letter-to-Shareholders-and-Provides-Corporate-Update.html

[5] https://www.inside.beer/news/detail/usa-molson-coors-ends-two-joint-ventures-at-once

[6] https://www.startribune.com/lift-bridge-brewing-legal-fight-over-right-produce-cannabis-beverages-hard-seltzer-thc-cbd-marijuana/600292930?

23. SōRSE prepares tailored emulsions for customers at a loss—and in many cases, at no charge—to develop customer relationships with businesses who are often new to the cannabis good market. SōRSE makes substantial financial investments into each tailored emulsion, including hiring food scientists to develop calibrated emulsions tailored to fit product requirements, adjusting for viscosity, temperature, and taste, creating custom flavor profiles and blends, and investing in specialized equipment and personnel to perform long-term stability and shelf-life studies.

24. To develop emulsions customized for compatibility with clients' finished products, before a product is released and generally before SōRSE has received any financial compensation for its development work, SōRSE performs analytical testing for clients as a large portion of its product development cycle. As part of its efforts, SōRSE creates the initial emulsion formula, tests compatibility with their finished products, performs long term stability studies to analyze potency over a period of time from 30 days to over one year and provides reports to companies of SōRSE's findings and recommendations. SōRSE works with third parties to run initial testing according to SōRSE's specifications and then internally runs testing over the long term. These studies require technical expertise, appropriate equipment, and consumables including reagents. Studies include: long-term stability (whether the emulsion remains stable over 6, 12, 18, or 24 months); accelerated stability (whether elevated temperatures accelerate degradation or separation); temperature cycling (whether repeated heating and cooling destabilize the formulation); freeze-thaw testing (whether freezing and thawing affect droplet size, potency, or physical stability); light exposure (whether UV or visible light degrades cannabinoids); oxidation studies (whether oxygen exposure causes degradation of cannabinoids or other ingredients); packaging compatibility (whether the emulsion interacts with or gets stuck to plastic, glass, aluminum, or packaging liners); dilution stability (whether the emulsion remains stable when incorporated into different beverages); pH stability (whether changes in acidity affect the emulsion); and physical separation (whether droplets aggregate, cream, sediment, or coalesce over time). Each of these tests requires technical competency and expertise in addition to equipment, reagents, and other consumables to run the studies.

25. SōRSE generally receives its first payment from a customer when the customer decides to move forward with commercializing a product. Due to the technological difficulty in developing tailored emulsions appropriate for each customer's and each product's needs discussed above, and ensuring that the tailored emulsions provide satisfactory stability, consistency, effect, and flavor profiles, SōRSE accordingly invests significant monetary resources into obtaining and formulating emulsions for customers before ever obtaining any payment.

**D. Vertosa's Infringing Emulsion Products and Services**

26. Ben Larson and Dr. Harold Han founded Nanogen Labs in 2018 and rebranded the company as Vertosa in 2019.

27. On information and belief, Vertosa was unable to successfully create an emulsion method until SōRSE published its first application U.S. Patent Application No. 16/010,082 on December 20, 2018. The '082 Application is a parent to the asserted U.S. Patent No. 12,551,416.

28. On information and belief, Vertosa's infringing emulsions are the source of essentially all of Vertosa's revenue.

29. On information and belief, Vertosa represents to SōRSE's customers, for which SōRSE has done substantial work to create customized emulsions tailored to the customer's product, that Vertosa's emulsions are technically indistinct from SōRSE's customized emulsions.

30. On information and belief, Vertosa's products are of a lower quality than SōRSE's emulsions with respect to their stability, consistency, and flavor profiles. On information and belief, Vertosa's false representations to customers that their emulsions are technically indistinct from SōRSE's customized emulsions have caused and will continue to damage SōRSE by causing customers to choose to replace SōRSE emulsions with lower-quality Vertosa formulations.

31. On information and belief, Vertosa is undercutting SōRSE's prices and selling its infringing emulsions at a loss to suppress prices and capture market share. On information and belief, Vertosa is operating at a loss on these sales.

**COUNT I**

**(INFRINGEMENT OF THE U.S. PATENT NO. 12,551,416 (35 U.S.C. § 271))**

32. Plaintiff incorporates by reference the allegations of all of the foregoing paragraphs as if fully restated herein.

33. U.S. Patent No. 12,551,416 (the "'416 Patent"), entitled "Method for Preparing Stable Liquid Emulsion Forms of Plant Extract," was filed on November 20, 2023, issued on February 2, 2026, and names Rodger Scott Riefler, Juan Jorge Ayala, and Howard M. Lee as inventors. A true and correct copy of the '416 Patent is attached hereto as Exhibit 1. The '416 Patent is directed to methods for preparing stable liquid emulsion forms of plant extracts.

34. SōRSE owns all rights, title, and interest in the '416 Patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future infringement.

35. The '416 Patent is valid and enforceable and directed to patentable subject matter.

36. As a matter of law, the notice provisions of 35 U.S.C. § 287 do not apply in this case for the '416 Patent and therefore SōRSE has satisfied its obligations under 35 U.S.C. § 287 with respect to the '416 Patent.

37. Defendant Vertosa has infringed and continues to infringe, directly and indirectly, literally or under the doctrine of equivalents, the '416 Patent, by using, or by making, importing, offering to sell, and/or selling products or processes that are used to, practice one or more inventions claimed in the '416 Patent. Such infringing conduct includes, but is not limited to, manufacturing cannabis emulsions in accordance with the claimed method of the '416 Patent.

38. As an illustrative but nonexclusive example, Vertosa's manufacturing of cannabis emulsions infringes, for example, at least claim 10 of the '416 Patent. Claim 10 of the '416 Patent recites:

Claim 10

A method for preparing stable liquid emulsion forms of plant extract, comprising:

mixing a plant extract with diluent oil as an oil mixture;

dispersing an emulsifying agent in water as an emulsifying solution;

mixing the oil mixture and emulsifying solution;

homogenizing the mixed oil mixture and emulsifying solution as a liquid form of the plant extract;

mixing the liquid emulsion with an edible or drinkable item to be ingested by an individual and wherein upon ingestion, the liquid emulsion with the plant extract passes directly through the individual's stomach to enter the individual's digestive track where the plant extract is absorbed to reduce an amount of time in which effects of the plant extract commence, wherein droplets of the plant extract in the liquid emulsion each comprise a size less than 2 microns.

Ex. 1 at col. 7:60-8:13.

39. On information and belief, the patented method of claim 10 of the ’416 Patent is performed by a joint enterprise formed between Vertosa and its partners, such as cannabis product brands and/or edible cannabis product contract packagers (“co-packers”).

40. Vertosa engages with its partners in wholesale and partnerships in beverage development and manufacturing and scaling (“We’re your backstage team for every launch, pivot, and innovation.”). For example, Vertosa enters into an agreement, express or implied, with its partners to prepare cannabis emulsion:







Screenshots of Vertosa's website, https://vertosa.com/contact-us/ and https://vertosa.com/#, respectively, captured on November 4, 2026.

41. Vertosa and its partners have a common purpose to be carried out by the group, namely preparing cannabis emulsions to be incorporated into edible and drinkable products for sale:




Screenshot of Vertosa's website, https://www.vertosa.com/emulsion-products, captured on July 21, 2026.

42. Vertosa and its partners enter into a community of pecuniary interest in that purpose, among the members, specifically in that Vertosa and its partners both expect to profit from the preparation and sale of edible products containing cannabinoid emulsions.



Screenshot of Vertosa's website, https://vertosa.com/#, captured on November 4, 2026.

43. Vertosa and its partners have an equal right to a voice in the direction of the enterprise, which gives an equal right of control.




Screenshots of Vertosa's website, https://vertosa.com/proven-results/#brands, captured on November 4, 2026.

44. In the alternative, on information and belief, Vertosa directs or controls the acts of its partners such that it is liable for the acts of its partners. For example, on information and belief, Vertosa incorporates into its agreements with partners that they follow the steps for adding Vertosa's emulsions to prepare beverages for consumers in their "Cannabis Beverage Manufacturing Handbook (the "Handbook"), which Vertosa provides to potential customers on request:



CANNABIS BEVERAGE MANUFACTURING

CHAPTER 16

## Order of Addition

The order in which each ingredient is added into a mixing tank can have a major impact on the final product's homogeneity and potency accuracy. When not done right, it may create pockets of highly concentrated aggregates that cause product failure such as flavor and emulsion system instability or other unwanted reactions. Follow this order of addition to ensure success.

### Order of addition

1. Once the target amount of water is in the mixing tank, processing aides (such as antifoaming agents) and preservatives should be added immediately.
2. Next, add flavoring agents, such as sugars, natural sweeteners and other special flavoring concentrates (usually in an Ethanol or Propylene glycol carrier).
3. After the flavoring agents are incorporated, add ingredients that will adjust the pH of the beverage, including:
   - Food acids (citric acid, ascorbic acid, malic acid, tartaric acid...)
   - Juices, concentrates, purees, etc.
4. At this point, make adjustments to color with food dye if needed.
5. After the color has been adjusted, the tank is filled with the near-final un-infused product base. Leave enough time to fully mix all ingredients. We highly recommend taking a sample, testing for Brix, pH and density and comparing it to your Vertosa compatibility report and the target set by the brand.
6. Once the beverage has been fully homogenized and its sample verified, add the emulsion. Refer to our guide on Emulsion Dosing for best practices.
7. Allow enough time during mixing to reach potency homogeneity. It is highly suggested to take a sample and test pH, Brix and density at this point. In addition, test samples for potency and compare them to target specs.

The flowchart on the next page illustrates the correct order of addition.

39



40

Handbook at 39-40.

45. The preamble is properly construed as non-limiting. To the extent the preamble of claim 10 of the '416 Patent is limiting, the Accused Methods embody the claimed method for preparing stable liquid emulsion forms of plant extract. For example, each of the Accused Services and Products includes methods for preparing cannabis compounds, such as cannabinoids, into stable emulsions intended to "blend effortlessly into beverages."




Screenshots of Vertosa's website, https://vertosa.com/solutions/, captured on November 4, 2026.

46. Vertosa mixes a plant extract with diluent oil as an oil mixture. Diluent oil is a carrier oil. Vertosa takes a plant extract, such as a THC distillate, which is highly viscous or waxy, and oil-soluble. On information and belief, based on technical analysis of a sample of Vertosa



10292948

emulsion obtained by SōRSE, Vertosa mixes the plant extract with a diluent oil such as a medium chain triglyceride, MCT oil, or palm oil. Moreover, in its publication "Differences Between Vertosa's Emulsion Categories," Vertosa notes that it mixes a Plant Oil, or a diluent oil, to create an oil mixture:

> 2. Natural Formula
>
> Vertosa's Natural formula emulsions are the sum of hydrophobic and hydrophilic parts of separate plants. These naturally-occurring parts are then processed together to create the finished surfactant. In Vertosa'a emulsions, the surfactant is made from the building block of glycerol and fatty acid, shown in Figure 3.




Figure 3. Route of producing natural surfactant

"Differences Between Vertosa's Emulsion Categories"; available at https://f.hubspotusercontent20.net/hubfs/6317423/WhitePapers/Differences+Between+Vertosas+Emulsion+Categories.pdf.

47. Vertosa disperses an emulsifying agent in water as an emulsifying solution. As explained in the `416 Patent, many plant extracts, such as cannabinoids, are oil-based and are therefore hydrophobic (do not mix well with water). An emulsifying agent (emulsifier) has both hydrophilic and hydrophobic components, which helps mix the oil-based plant extract with water. Ex. 1 at cols. 1:13-22 and 1:67-2:7. Examples of emulsifiers include quillaja extract, lecithin, gum acacia, various proteins, among others. Ex. 1 at col. 3:66-4:6. For example, in the article, "Science

for product makers: Know your cannabis beverage ingredients: Quillaja,"[7] Harold Han, Chief Scientific Officer of Vertosa, explains that quillaja coats the cannabis oil droplets, making the droplets water compatible. On information and belief, based on technical analysis of a sample of Vertosa emulsion obtained by SōRSE, Vertosa uses quillaja extract as an emulsifier in their emulsion.

48. Vertosa mixes the oil mixture and emulsifying solution. For example, Vertosa converts its THC distillate into an emulsion by combining the emulsifier with the plant extract (THC distillate), resulting in an emulsion having a milky appearance:




Screenshots from Beverage Trade Network, "How Cannabis Beverages are Made | Harold Han", available at https://youtu.be/9iOGiGbceaU?si=sb4c1i8cvsA9HTH1&t=891 at 14:31 and 15:01, respectively, captured on November 4, 2026 (Harold Han is the Chief Scientific Officer at Vertosa).

49. On information and belief, Vertosa mixes the emulsifying solution separately from the THC-oil mixture before mixing the two solutions together. If, however, Vertosa mixes the THC-oil mixture, water, and emulsifier together in a single step rather than mixing the emulsifying solution separately from the THC-oil mixture, this single step process is equivalent to

[7] Available at https://www.linkedin.com/pulse/science-product-makers-know-your-cannabis-beverage-ingredients-han-1c

mixing the emulsifying solution separately as it performs substantially the same function, in substantially the same way, to achieve the same result.

50. Vertosa homogenizes the mixed oil mixture and emulsifying solution as a liquid form of the plant extract. For example, Vertosa uses ultrasonication to homogenize the mixed oil mixture and emulsifying solution as a liquid form of the plant extract. Homogenization helps to reduce the size of the droplets, thereby stabilizing the overall solution, as Vertosa describes in the screenshots of the video shown below:




Screenshot from Vertosa's YouTube video, https://youtu.be/uc-g1rR54Ts?si=KwfeOf682ERrigFT&t=52 at 00:52, captured on November 4, 2026.

51. The '416 Patent describes ultrasonication as an exemplary method of homogenizing the mixed oil mixture. Ex. 1 at col. 4:44-49.

52. Vertosa's partners, either at the direction of Vertosa or in a joint enterprise with Vertosa, mix the liquid emulsion with an edible or drinkable item to be ingested by an individual and wherein upon ingestion, the liquid emulsion with the plant extract passes directly through the individual's stomach to enter the individual's digestive track where the plant extract is absorbed to reduce an amount of time in which effects of the plant extract commence, wherein droplets of the plant extract in the liquid emulsion each comprise a size less than 2 microns.

53. As described above, in Paragraphs 39 through 44, Vertosa has formed a joint enterprise with its partners to produce cannabis emulsion products and/or conditions participation of its partners in Vertosa's cannabis emulsion mixing programs, and as part of that joint enterprise or conditioned participation, causes its partners to perform the final step of mixing the liquid

emulsion with a drinkable item (a beverage) to be ingested by an individual.

54. Vertosa makes an emulsion having droplets with "sizes ranging from sub-100nm to sub-micron [sic]" (therefore smaller than 2 microns) to achieve bioavailability having an "[o]nset time under 15 minutes," i.e., where the plant extract is absorbed to reduce an amount of time in which effects of the plant commence:


CANNABIS BEVERAGE MANUFACTURING

**Developing the emulsion**

There are many considerations cannabis infusion experts account for when developing an emulsion system, including droplet size and emulsifier type. The beverage maker should be aware of these characteristics to understand how they might affect onset, flavor and how they might interact with other ingredients in the final product.

**Droplet size**

Our industry generally agrees that smaller droplet sizes deliver a quicker onset than larger ones in infused products. The supporting theory is that our small intestine generates *mixed micelles* (10-100nm), which is the vehicle that transfers fat and fat molecules (THC) into epithelial cells to be absorbed (source). The quicker THC transfers into mixed micelles, the faster it can be absorbed. Compared to distillate, nanoemulsion provides a much quicker path to allow THC transfer into mixed micelles, thus delivering a faster onset.

**Emulsifier type**

Selecting an emulsifier is a balancing act. Each type has its own characteristics that affect onset, appearance, taste and even stability. Ideally, the emulsion formulator seeks to develop a formula that delivers optimal results for all attributes while considering the product owner's top priorities, however that is difficult to achieve at this time. When enhancing one feature, performance in other features may be sacrificed. For example, smaller droplet sizes can usually produce a less turbid (cloudy) product, but it may come with bitter notes. Further, each emulsifier itself comes with a unique flavor and mouthfeel.

When incorporated into emulsion, the active ingredient's oil droplets are broken up into billions of smaller droplets, exponentially increasing the amount of surface area. The enlarged surface area amplifies the distillate's flavor, creating a much more intense sensory experience. If the distillate has a slight bitter taste, the emulsified product may have a strong bitter taste.

The final emulsion flavor is not only affected by the *type* of emulsifier, but also by the *amount* of emulsifier used. In some cases, higher quantities of emulsifier are needed to reach certain properties, such as onset and transparency, impacting the final beverage's sensory dramatically. It's all connected: smaller droplets create a more transparent beverage, resulting in a quicker onset but a more bitter product.

Because of this, it takes careful consideration to find the appropriate balance between the emulsifier type and its application to optimize emulsion stability and sensory.

8

Handbook at 8.




Screenshot of Vertosa's website, Source: https://www.vertosa.com/emulsion-products, captured on July 21, 2026.

55. On information and belief, Vertosa uses substantially the same infringing process for all cannabis emulsion forms it provides to partners and customers.

56. Because, as set forth above, and in particular, in Paragraphs 39 through 55, as an illustrative but nonexclusive example and on information and belief, Vertosa's manufacturing of cannabis emulsions, in a joint enterprise with its partners or through its direction of or conditions on its partners, practices each and every limitation of at least claim 10 of the '416 Patent, Vertosa infringes the '416 Patent each time it manufactures cannabis emulsions using the methods described above.

57. On information and belief, Vertosa had actual notice of the '416 Patent at least as early as the date on which Vertosa received a copy of the original Complaint in this lawsuit.

58. On information and belief, Vertosa manufactures cannabis emulsions using a method that practices each and every limitation of at least one claim of the '416 Patent in order to produce cannabis emulsions for sale by its customers.

59. Because, as set forth above, and in particular, in Paragraphs 39 through 55, as an illustrative but nonexclusive example and on information and belief, Vertosa manufactures cannabis emulsions for sale by its customers using a method that practices each and every limitation of at least one claim of the '416 Patent, each sale of cannabis emulsions or products containing cannabis emulsions by Vertosa's customers made according to the method of the '416 Patent is an act of infringement of the '416 Patent under 35 U.S.C. § 271(g).

60. Because, as set forth above, and in particular, in Paragraphs 39 through 55, as an illustrative but nonexclusive example and on information and belief, Vertosa manufactures cannabis emulsions for sale by its customers using a method that practices each and every limitation of at least one claim of the '416 Patent

61. Because, as set forth above, and in particular, in Paragraphs 39 through 55, as an illustrative but nonexclusive example and on information and belief, the cannabis emulsions manufactured by Vertosa, when sold to Vertosa's partners, have no substantial non-infringing uses and are especially made or especially adapted for infringement, each sale by Vertosa of its cannabis emulsions to its partners after it had actual notice of the '416 Patent is an act of contributory infringement of the '416 Patent under 35 U.S.C. § 271(c).

62. Vertosa's infringement of the '416 Patent has been and remains willful and deliberate, starting from at least the date on which Vertosa received a copy of the original Complaint in this lawsuit.

63. Vertosa's activities have been without SōRSE's authorization.

64. As a result of Vertosa's infringement, SōRSE has been damaged and will be further damaged, and is entitled to be compensated for such damages pursuant to 35 U.S.C. § 284 in an amount that presently cannot be ascertained, but that will be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court to enter judgment against Defendant and against its respective subsidiaries, successors, parents, affiliates, officers, directors, agents, servants, employees, and all persons in active concert or participation with them, granting the following relief:

1. The entry of judgment in favor of Plaintiff and against Defendant;

2. An award of damages against Defendant adequate to make Plaintiff whole for Defendant's patent infringement, including its lost profits, but in no event less than a reasonable royalty as permitted by 35 U.S.C. § 284, together with prejudgment interest from the date the infringement began;

3. An award of enhanced damages for willful patent infringement of three times the amount of damages found or assessed starting from the date on which Defendant received a copy of the Complaint in this lawsuit, pursuant to 35 U.S.C. § 284;

4. A finding that this case is exceptional and an award to Plaintiff of its reasonable attorneys' fees and costs as provided by 35 U.S.C. § 285;

5. A permanent injunction prohibiting further infringement of the '416 Patent; and

6. Such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Dated: November 20, 2026

**HG LAW LLP**
GREGORY J. LUNDELL
BRIAN J. BECK
G. AMY LAI
KASTURI SENGUPTA

By: */s/ Gregory J. Lundell*
Gregory J. Lundell
Attorneys for Plaintiff
SōRSE Technology Corporation